IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | **Chapter 13** |
| DEBRA HARRIS-PENA, | : | |
| Debtor. | : | **Case No. 07-14756(JKF)** |

| | | |
|---|---|---|
| DEBRA HARRIS-PENA, | : | |
| Plaintiff, | : | |
| v. | : | |
| THE CIT GROUP/CONSUMER FINANCE, INC. | : | |
| | : | |
| and | : | |
| | : | |
| HABANA ACQUISITION CORP., | : | **Adversary No. 08-0002 SR** |
| Defendants. | : | |

# Memorandum Opinion

BY:   STEPHEN RASLAVICH
      Chief United States Bankruptcy Judge

Before the Court are cross-motions for summary judgment by the plaintiff, Debra

Harris-Pena ("Debtor"), and defendant, CIT Group/Consumer Finance, Inc. ("CIT").

Debtor borrowed $51,660 from CIT (the "CIT Loan") to refinance a purchase money

mortgage loan which she obtained from Habana Acquisition Group ("Habana") in

connection with the purchase of her home at 1949 Ashley Road, Philadelphia,

Pennsylvania (the "Property").

In this adversary proceeding, Debtor asserts claims against CIT under: (1)

Pennsylvania's usury law,  Act 6 of 1974 ("Act 6"), 41 P.S. §§ 101 *et seq.; (2)* the Truth

in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.;* and (3) the Home Ownership and

Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. §§ 1639.  Debtor moves for

summary judgment as to liability on her claims under each of these statutes and CIT

moves for summary judgment on the same claims.[1]   Debtor also moves for summary

judgment as to statutory damages on her TILA and HEOPA claims.  Upon consideration

of the motions, summary judgment shall be granted in Debtor's favor and against CIT as

to liability on her claim under Act 6.  Both parties' motions for summary judgment shall

be denied as to Debtor's other claims.[2]

---

[1]  CIT moves for summary judgment on Debtor's claims under Act 6, TILA and
HOEPA and contends that, to the extent the aforementioned claims serve as the basis
for Debtor's claims in Count IV and V of the Complaint, it is entitled to summary
judgment on those claims as well.

[2]  The hearing on the parties' cross-motions for summary judgment was held
before the Honorable Jean K. FitzSimon.  Subsequently thereto, this adversary
proceeding was re-assigned to the undersigned Judge.  The hearing record on the
cross-motions has been transcribed and reviewed.  Pursuant to Rule 9028 of the
Federal Rules of Bankruptcy Procedure, which makes Rule 63 of the Federal Rules of
Civil Procedure applicable hereto, this decision is being issued by the undersigned
Judge whom certifies that he is familiar with the record and has determined that the
motions can be decided without any prejudice to the parties.

## Background

### *Debtor's Bankruptcy Case and*
### *this Adversary Proceeding*

In August of 2007, Debtor filed a Voluntary Petition for Relief under Chapter 13 of

the Bankruptcy Code.  On January 3, 2008, she commenced this adversary proceeding

against CIT by filing a complaint.  She subsequently filed an amended complaint (the

"Amended Complaint") against both CIT and Habana.  However, in July of 2008, Debtor

settled with Habana, leaving CIT again as the only defendant against whom she is

proceeding.

### *Background and Facts*
### *Concerning the Loans*

For three years, from approximately 1996 to 1999, Debtor and her husband lived

in and rented a property from Tobias Biddle, the President of Habana. *Harris-Pena Dep.*

*at 12-13.*  Debtor, however, was interested in owning a home and she shared this

information with Biddle. *Id. at 13-16.*  He informed her that Habana owned a Property

which she could purchase and, further, that Habana would finance the purchase for her.

*Id. at 16.*

In August of 1999, Debtor borrowed $58,500 from Habana to purchase the

Property. *Id. at 14-16; Exhibit H-3 to Harris-Pena Dep.*  In connection with this loan,

Debtor executed a note (the "Note") for the aforementioned amount, obligating her to

make monthly payments of $601.74 and pay the balance due thereunder on September

3

1, 2029.[3]  *Id.* As security for the loan, Debtor executed a purchase money mortgage (the

"Habana Mortgage") in favor of Habana.  *Exhibit H-2 to Harris-Pena Dep.*  In connection

with the transaction, Debtor purchased title insurance in the amount of $556.88.

*Declaration of Debra Harris-Pena in Support of Plaintiff's Motion for Summary Judgment*

*("Harris-Pena Decl.") at ¶7 & HUD-1 Settlement Sheet attached thereto.*  Habana was

listed as the "insured" on the policy.  *See Exhibit B-11 (Policy of Title Insurance issued*

*by First American Title Insurance Company) to Biddle Dep.*

At some point in time, Biddle told Debtor that he was tired of receiving monthly

payments from her on the Note.  *Harris-Pena Dep. at 31-34.*  He wanted her to

refinance the loan from Habana.  *Id.*[4]  Either through Biddle or through a broker to

whom Biddle referred business, Debtor was put in touch with CIT which agreed to do a

refinancing for her.[5]  Biddle hoped that the refinancing would pay off Debtor's loan from

---

[3]  For reasons that are not clear from the record, Debtor also executed a Balloon
Note for the same loan from Habana, obligating her to make monthly payments of
$601.74 and pay the balance due thereunder on February 1, 2001.  *Exhibit H-1 to
Harris-Pena Dep. (Balloon Note).*  The interest rate on the Balloon Note is the same as
on the Note.  However, the Balloon Note was never utilized.  *Biddle Dep. at 41-42.*  As
Biddle noted at his deposition, the Habana Mortgage specifically references the terms of
the Note.  *Id.; Exhibit H-2 to Harris Pena Dep. (Habana Mortgage).*

[4]  At Debtor's Deposition, she testified that Biddle repeatedly told her that he
wanted "all my money at one time, Debra" and that CIT was willing to pay him " all at
one time."  Harris-Pena Dep. at 31-32.

[5]  According to Debtor's deposition testimony, Biddle facilitated the refinancing
with CIT and she did not have any contact with CIT until the loan closing.  *Harris-Pena
Dep. at 21-30.*  However, Biddle testified during his deposition that he gave Debtor's
name to a mortgage broker to whom he referred refinancing business and that the
Broker, in turn: (i) contacted the Debtor; and (ii) chose CIT as the company to refinance
(continued...)

4

Habana in full; however, he knew at or shortly before the closing on Debtor's refinancing

with CIT that there would be a balance still due and owing on the Note. *Biddle Dep. at*

*22.* According to a letter, dated March 26, 2001, from Biddle (the "Biddle Letter"), the

payoff on the Note was $58,417.87. *Exhibit B-3 to Biddle Dep. (Biddle Letter).* This

amount included a satisfaction fee of $50.00 which, Biddle explained, was the cost for

removing a mortgage from public records. *Biddle* Dep. at *50, Exhibit B-3 to Biddle Dep.*

*(Biddle Letter).* Biddle included this charge in the pay-off because he intended to file a

satisfaction on the Habana Mortgage so that it would be removed from the public

record. *Biddle Dep. at 50.* While Biddle provided the payoff information to the title

company that was involved with Debtor's refinancing and possibly to CIT as well, Biddle

does not think it was given to the Debtor. *Biddle Dep. at 20-21.*

On or about March 21, 2001, Biddle executed a Mortgage Subordination

Agreement between CIT and Habana. *Biddle Dep. at 29-31; Exhibit 2 to Biddle Dep.*

*(Mortgage Subordination Agreement).* According to the Mortgage Subordination

Agreement, Debtor executed a mortgage in the amount of $15,000 (the "$15,000

Mortgage") in favor of Habana on March 30, 2001. *Id.* Biddle had no explanation for

why the Mortgage Subordination Agreement, dated March 21, 2001, referenced a

mortgage and note allegedly executed by the Debtor nine days later. *Biddle Dep. at 30.*

Insofar as Biddle remembers, the $15,000 Mortgage was intended to make up the

---

[5](...continued)
Debtor's loan. *Biddle Dep. at 15-17.*

5

difference between the proceeds which he received from the CIT Loan and the balance

due to Habana on the Note. *Biddle Dep. at 32-33.*

Pursuant to the terms of the Mortgage Subordination Agreement, Habana agreed

that the $15,000 Mortgage was subordinate and junior to CIT's mortgage lien on the CIT

Loan. *Id.* However, there is no evidence that Debtor ever executed a $15,000

mortgage in favor of Habana and no evidence that such a mortgage was ever recorded.

Importantly, the Mortgage Subordination Agreement does not mention subordinating

the Habana Mortgage to the CIT Mortgage. *Biddle Dep., Exhibit 2 (Mortgage*

*Subordination Agreement).* The apparent reason that the Habana Mortgage is not

mentioned in the Mortgage Subordination Agreement is that Biddle planned on

satisfying that mortgage and having Debtor execute a separate $15,000 Mortgage

which he would then record against the Property, thereby giving him a second lien on

the Property subordinate to CIT's lien.

The CIT Loan closing (the "Loan Closing") took place on March 30, 2001, at

Biddle's office. *Harris-Pena Decl. at ¶2; Harris-Pena Dep. at 23-25.* Prior to the closing,

Debtor never received any written disclosures about the CIT Loan. *Harris-Pena Decl.*

*¶¶5-6.* She did not bring anything with her to the closing, including any evidence to

show that she had purchased title insurance for the Property in 1999. *Id. at 104.*

However, Debtor did not know what title insurance was and had no recollection of

having previously purchased any. *Id.* There is a document titled "Title Insurance

Election" which appears to contain Debtor's signature and is dated 3/30/01 (the date of

6

the closing on her loan with CIT). On this document, Debtor checked the box electing to have CIT obtain a title insurance policy for her. *See Exhibit H-15 to Harris-Pena Dep.*

While Biddle's presence at the Loan Closing is undisputed, *see Biddle Dep. at 24,* the extent of his involvement in the refinancing and the extent of his communication with CIT about the refinancing is in dispute. Debtor's testimony suggests that: (i) Biddle arranged the refinancing with CIT; (ii) she received no communication from CIT prior to the Loan Closing; (iii) she never filled out a mortgage application form for the refinancing; (iv) Biddle (rather than Debtor) was the only one who communicated with CIT about the refinancing; and (v) Debtor had no involvement in the refinancing other than to show up at the Loan Closing and sign the documents which she was told to execute. *See Harris-Pena Dep. at 21-30, 51-53, 81.* Biddle, on the other hand, testified that he had no correspondence with CIT until shortly before or at the Loan Closing and that he had no communication with CIT thereafter. *See Biddle Dep. at 25-26.*

At the Loan Closing, Debtor executed a promissory note (the "Promissory Note") in the amount of $51,660, with interest at the rate of 11.99% per annum.[6] *Exhibit H-18 to the Harris-Pena Dep.* As security for the CIT Loan, Debtor executed a mortgage (the

---

[6] The terms of the Promissory Note obligated Debtor to make an initial monthly payment of $720.25 followed by 359 monthly payments in the amount of $530.98. *Exhibit H-18 to the Harris-Pena Dep.*

"CIT Mortgage"), also dated March 30, 2001, granting CIT a lien on the Property.[7]

*Exhibit H-17 to the Harris-Pena Dep.*

According to the HUD-1 Settlement Statement, the Settlement Agent at the

closing on March 30, 2001 was Express Financial Services.[8]  Page 2 of the Settlement

Statement lists the following amounts as Settlement Charges:

| | |
|---|---|
| Underwriting Fee to CIT | $495.00 |
| Loan Discount to CIT | $504.10 |
| Appraisal Fee to Raymond Rizzo | $250.00 |
| Appraisal Review Fee to CIT | $42.00 |
| Credit Bureau Fee to CIT | $4.00 |
| Mortgage Broker Fee to Choice One Mortgage | $2,550.00 |
| Mortgage Broker Fee by Lender to Choice One Mortgage | $952.00 |
| Overnight Courier Fee to CIT | $30.00 |
| Closing/Escrow/Settlement Fee to Express Financial Services | $175.00 |
| Title examination fee to Express Financial Services | $75.00 |
| Title insurance to Express Financial Services | $540.75 |
| Recording Fees: Mortgage | $43.50 |

---

[7]  The CIT Mortgage contains the following language:

> I further warrant that the lien created by this mortgage is a
> valid and enforceable first lien, subordinate only to
> easements and restrictions of record on the date of this
> mortgage, and that during the entire term of the note, such
> lien will not become subordinate to anything else.

*Exhibit H-17 to Harris-Pena Dep.*

[8]  The HUD-1 Settlement Statement is a form "prescribed by the Secretary ... for
setting forth settlement charges in connection with either the purchase or the
refinancing ... of 1- to 4- family residential property."  24 C.F.R. §3500.2(b)(current
through March 30, 2001).

8

|  |  |
|---|---|
| Disbursements to others | $47,845.84 |
| TOTAL SETTLEMENT CHARGES | $52,305.19 |

*Exhibit D-9 to Defendant's Motion..*

Habana received $43,000 of the disbursements from the CIT Loan. *Exhibit H-16 to the Harris-Pena Dep.* Notably, the difference between the $58,417.87 payoff which Debtor owed on the Note and the $43,000 which Habana received from the CIT Loan is $15,417.87, which supports Biddle's recollection that the $15,000 Mortgage was intended to make up the difference between the $43,000 in proceeds which he received from the CIT Loan and the balance due to Habana on the Note.

The action which Biddle subsequently took (after Habana received the $43,000 from the CIT Loan) to recover the balance owed on the Note is disputed; however, it is undisputed that Biddle intended: (i) to have the Habana Mortgage marked satisfied and removed from the public record; (ii) to obtain a second mortgage on the Property in favor of Habana for approximately $15,000 to secure the balance that Habana was owed on the Note; and (iii) for the second mortgage in favor of Habana to be subordinate to the CIT Mortgage. *Biddle Dep. at 27, 32-36, 40.* Contrary to Biddle's intention, the Habana Mortgage was not marked satisfied until after this adversary proceeding was filed.[9] Moreover, as stated above, there is no mortgage for $15,000 or

---

[9] In the Settlement and Release of Claims by and Between Debra Harris-Pena and Habana Acquisition Corporation, it states that "[o]n May 28, 2008, Habana recorded with the Office of the Recorder of Deed of Philadelphia County a Satisfaction of the Purchase Money Mortgage [which is the mortgage executed by Debtor in favor of Habana for the loan of $58,500], executed on May 13, 2008, and recorded under

(continued...)

9

thereabout of record against the Property.  The only other mortgage of record against

the Property (other than the Habana Mortgage and the CIT Mortgage) is a mortgage,

dated December 31, 2000, in favor of Habana for $5,000 (the "$5,000 Mortgage") that

was not recorded until May 23, 2001.  *Exhibit 9 to Biddle Dep.*

According to the $5,000 Mortgage, it constitutes security for a $5,000 loan which

Habana made to Debtor that is evidenced by another note (the "$5,000 Note").  *Exhibit*

*10 to Biddle Dep.*  While Biddle could not recall the reason for the $5,000 Note, he

suggested that it may have been used to cover the cost of repairs that needed to be

made to the Property.  *Biddle Dep. at 44-45.*  According to its terms, the $5,000 Note

obligated Debtor to commence making monthly payments of $87.39 on February 1,

2001, which was approximately two months before the Loan Closing.  *Exhibit 10 to*

*Biddle Dep.*  Interestingly, Debtor admitted signing the $5,000 Note but denied that it

contained the terms currently set forth therein when she signed it.[10]  *Harris-Pena Dep.*

---

[9](...continued)
document identification number 51911969."  *See Docket Entry No. 25* (underlining
added).

[10]  When asked about the $5,000 Note, Debtor testified as follows:

> Q.    I'm going to show you what we've marked as H-5.  It's
>        a note, two pages.
>
> A.    On his page right here?
>
> Q.    Referring to H-5.
>
> A.    H-5, the first page, it didn't have this stuff right here.

(continued...)

*at 47-50.* Debtor also denied signing the $5,000 Mortgage. *Harris-Pena Dep. at 46-47.*

However, for purposes of resolving the matters herein, it is irrelevant whether Debtor

signed the $5,000 Note in its current form and whether she signed the $5,000

Mortgage.

---

[10](...continued)

Q.    It didn't have what.

* * *

Q.    You're referring to number two interest and where it's typed in 12.000 percent?

A.    This wasn't filled out up here. There was nothing filled out.

Q.    Be specific. Point to what wasn't filled out so what we can put in on the record.

A.    There wasn't no 5,000.

Q.    Upper right.

A.    That wasn't there. It had no interest rate on there.

Q.    The 12 percent. Okay.

A.    And it didn't have no 1st of February and all this dates, these months and stuff, it wasn't on there.

Q.    Referring to paragraph 3, February 1, 2001 [the date when the payments under the $5,000 Note commenced] wasn't there and January 1, 2008 [the "maturity date" of the $5,000 Note] wasn't there.

A.    Yes, it wasn't there. It just had the address where I paid him. And than it just had this amount right here, 87.39.

*Harris-Pena Dep. at 47-48.*

11

When Biddle was asked at his deposition what, if anything, he told Debtor after discovering that her refinancing would leave a balance due on the Note, he testified that he told her:

> There's not going to be enough funds to pay off the
> mortgage, and I'd like to record a receivable for the balance.

*Biddle Dep. at 22-23.* According to Biddle, Debtor agreed to his request. *Id. at 23.*

Debtor's version of what Biddle did to recover the balance due on the Note is quite different. According to Debtor, she thought that she was only going to be paying CIT and "didn't expect to pay Mr. Biddle." *Id. at 83.* However, Biddle called her and told her that she still owed him $87 per month. *Id. at 82-84.* When she asked him why, he told her that "CIT didn't give him all his money that he asked them for." *Id. at 83-84.* According to Debtor, although she repeatedly asked Biddle for the balance owed on the Note, he never answered her question. *Id.* She continued making monthly payments of $87 to Biddle for "more than two years." *Id. at 84-85.*

## Analysis

### I. Standard of Review

Either party to a lawsuit may file a motion for summary judgment. Pursuant to Fed.R.Civ.P. 56,[11] the motion will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[11]  Rule 56 is applicable hereto pursuant to Fed.R.Bankr.P. 7056.

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary

judgment is not defeated by the mere existence of some disputed facts, but will be

defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-248 (1986). "Facts that could alter the outcome are 'material,'

and disputes are 'genuine' if evidence exists from which a rational person could

conclude that the position of the person with the burden of proof on the disputed issue is

correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996)

(citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255. Summary judgment may not be granted "if there is a

disagreement over what inferences can be reasonably drawn from the facts even if the

facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an

inference based upon a speculation or conjecture does not create a material factual

dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal,*

*Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990) (citation omitted).

The fact that the parties have filed cross-motions for summary judgment "does

not mean that the case will necessarily be resolved at the summary judgment stage."

*Reading Tube Corp. v. Employers Ins. of Wausau*, 944 F. Supp. 398, 401 (E.D. Pa.

1996). Each party "must still establish that no genuine issue of material fact exists and

that it is entitled to judgment as a matter of law.'" *Id.*

13

The moving party bears the initial burden of showing that there is no genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the

moving party has met its initial burden, the nonmoving party may not rely merely on

bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v.

DuFresne*, 676 F.2d 965, 969 (3d Cir.1982), but instead must present 'specific facts

showing that there is a genuine issue for trial,' *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting*

Fed.R.Civ.P. 56(e))." *J & J Sports Productions, Inc. v. 4326 Kurz, Ltd.*, 2009 WL

1886124, at *3 (E.D. Pa. June 30, 2009).

## II. Act 6 Claim

Act 6 is a "'comprehensive interest and usury law with numerous functions,' one

of which is that 'it offers homeowners with "residential mortgages" a measure of

protection from overly zealous "residential mortgage lenders.""" *In re Graboyes*, 223

Fed. Appx. 112, 114  (3d Cir. 2007) (*quoting Beckett v. Laux*, 395 Pa. Super. 563, 567,

577 A.2d 1341, 1343 (1990)). *See also Crossley v. Lieberman*, 868 F.2d 566, 570 (3d

Cir. 1989) ("Act 6 was promulgated to protect debtors who carry mortgage loans").  It

establishes a maximum lawful rate of interest for residential mortgages that are covered

by the Act.  41 P.S. §§ 201 & 301.  Pursuant to § 301, the maximum lawful rate of

interest for residential mortgages for the month of March, 2001, was 8%.  31 Pa. B.

1591.  The interest rate for the CIT Mortgage is 11.99%.  Consequently, *if the CIT

Mortgage is subject to Act 6*, the interest charged for the mortgage was 3.99% above

14

the lawful rate of interest.  Debtor argues that the CIT Mortgage is within the scope of

Act 6; not surprisingly, CIT contends the opposite.

In 2001,[12] Act 6 defined the term "residential mortgage" as "an obligation to pay a

sum of money in an original bona fide principal amount of fifty thousand dollars

($50,000) or less,[13] evidenced by a security document secured by a lien upon real

property located within this Commonwealth[.]" 41 P.S. §101 (2001).[14]  Debtor contends

that, even though the face amount of the Promissory Note is $51,660.00, the "principal

amount" of her loan was not more than $47,244.12.  As support for this contention,

Debtor cites to the definition for "finance charge" in Act 6.  *See Memorandum of Law in*

---

[12] As noted above, the CIT Loan closed in March of 2001.

[13] Act 6 has since been amended to increase the principal amount above
$50,000. *See* 41 P.S. § 101 (Supp. 2009).

[14] CIT argues unpersuasively that the definition of a "residential mortgage" under
Act 6 is a mortgage that "on its face" is for fifty thousand dollars or less. *Memorandum
of law of the Defendant CIT Group/Consumer Finance, Inc. in Support of its Motion for
Summary Judgment ("CIT's Brief") at 13.*  By viewing the definition of "residential
mortgage" in this manner, CIT is improperly merging the requirements set forth in the
definition.  As the district court aptly noted in First Business Credit Co. v. Grayboyes (In
re Grayboyes), 2006 WL 437546 (E.D. Pa. Feb. 22, 2006), *aff'd*, 223 Fed. Appx. 112
(3d Cir. 2007), the definition of "residential mortgage" in Act 6 contains "three primary
elements":

> (1) a monetary requirement that the secured loan include a
> principal of $50,000 or less; (ii) a documentation requirement
> that the borrower execute a document granting the lender a
> lien upon real property located within the Commonwealth;
> and (iii) a physical requirement that the property subject to
> the lien contains two or fewer residential units.

Id. at *7.  Contrary to what CIT asserts, the "monetary requirement that the secured loan
include a principal of $50,000 or less" is separate from the "documentation requirement
that the borrower execute a document granting the lender a lien upon real property."

*Support of Plaintiff's Motion for Partial Summary Judgment as to Defendant CIT*

*Group/Consumer Finance Inc. ("Debtor's Brief")* at III(A)(1).

Act 6 defines the term "finance charge", in pertinent part, as follows:

> [T]he total cost of a loan or charge for the use of money,
> including any extensions or grant of credit regardless of the
> characterization of the same and includes any interest, time
> price differential, points, premiums, finder's fees, and other
> charges levied by the residential mortgage lender directly or
> indirectly against the person obtaining the loan or against the
> seller, lender, mortgagee or any other party to the
> transaction except any actual settlement costs. The finance
> charges plus the actual settlement costs charged by the
> residential mortgage lender shall include all charges made
> by the residential mortgage lender to the residential
> mortgage debtor *other than the principal of the loan.*

41 P.S. § 101 (2001) (emphasis added). Based on this definition, there is a distinction

in Act 6 between the following components of a loan: (i) the finance charge; (ii)

settlement costs; and (iii) the principal of the loan.

The proposition that the face amount of a note and the principal amount of the

loan are not the same for purposes of Act 6 was recognized by the Pennsylvania

Superior Court in *General Electric Credit Corporation v. Slawek*, 269 Pa. Super. 171,

409 A.2d 420 (1979) (*en banc*). In this case, the borrowers executed a promissory note

in the amount of $65,849.78 and a mortgage on their residence in favor of the lender.[15]

---

[15] In *Slawek,* the mortgage loan was used to finance the acquisition of a sailboat.
At the time of the loan transaction, the definition of "residential mortgage" in Act 6
included such transactions. By an amendment enacted in 1978, the Pennsylvania
legislature added a second sentence to the definition of "residential mortgage" to limit
the application of Act 6 to "'transactions where the principal purpose of the transaction is
(continued...)

16

The Superior Court observed that, although the face amount of the promissory note was

$65,849.78, that amount included "finance charges and other fees" and that the

"principal amount" of the loan was less than $50,000, such that the transaction fit within

the definition of "residential mortgage" covered by Act 6. *Id.* at 422 n.5.

Based on the plain language of the definition for "finance charge" in Act 6 and the

Pennsylvania Superior Court's application in *Slawek* of the Act's definition for

"residential mortgage," this Court concludes that the principal amount of a loan, for

purposes of Act 6, excludes finance charges and actual settlement costs. Section 101

of Act 6 also defines the term "actual settlement costs," stating in relevant part:

> Actual settlement costs means reasonable sums paid for:
>
> (a) Any insurance premiums which have been approved by the Insurance Commissioner of the Commonwealth.
>
> (b) Title examination and search, and examination of public records.
>
> (c) The preparation and recording of any or all documents required by law or custom for settlement.

---

[15](...continued)
the purchase of, or improvement or repair in connection with the acquisition of, residential real property[.]'" *Slawek*, 269 Pa. Super. at 181 n.9, 409 A.2d at 424 n.9 (*quoting* 1978 Amendment to Act 6). However, by an amendment in 1979, the legislature deleted the second sentence thereby restoring the definition of "residential mortgage" to its pre-1978 version. In any event, the fact that the loan transaction was used to finance the acquisition of a sailboat was irrelevant to the reasoning and conclusion of the Slawek court that the loan transaction involved a residential mortgage within the meaning of Act 6.

(d) Appraisal and/or survey of property securing the loan.

(e) A single service charge, which shall include any consideration paid by the residential mortgage debtor and received and retained by the residential mortgage lender for or related to the acquisition, making, refinancing or modification of a residential mortgage loan, plus any consideration received by the residential mortgage lender for making a mortgage commitment, whether or not an actual loan follows such commitment.

\* \* \*

(f) Charges and fees necessary for or related to the transfer of the property or the closing of the residential mortgage loan, paid by the residential mortgage debtor and received by any party other than the residential mortgage lender, whether or not paid by the residential mortgage debtor directly to the third party or to the residential mortgage lender for payment to the third party.

41 P.S. §101 (2001). Based on this definition, the "actual settlement costs" for the CIT

Loan included the following items:

(i) Appraisal Fee of $250.00;
(ii) Mortgage Broker Fee of $2,550.00;
(iii) Mortgage Broker Fee by Lender of $952.00;
(iv) Title Examination fee of $75.00; and
(iv) Recording Fee of $43.50

Since these amounts total $3,870.50, the "principal amount" of the CIT Loan is less than

$50,000.00 ($51,660.00 - $3,870.50 = $47,789.50) which means that the loan is within

the scope of the Act.[16]

---

[16] The Federal Disclosure Statement for the CIT Loan lists the "finance charge" of the loan as $143,482.17" and the "amount financed" as "$47,859.90."

18

However, CIT raises another argument in opposition to Debtor's contention that

the CIT Loan is subject to Act 6. CIT argues that its loan was always "in first lien

position" and, consequently, that the interest rate limitations of Act 6 are inapplicable to

its loan pursuant to the Depository Institutions Deregulation and Monetary Control Act of

1980 ("DIDMCA"), 12 U.S.C. § 1735f-7a(a)(1).[17]  The DIDMCA provides, in pertinent

part, that state laws such as Act 6 which limit interest rates do not apply to loans that

are, *inter alia*, secured "by a first lien on residential real property[.]"  12 U.S.C.A. §

1735f-7a(a)(1)(A).

It is undisputed that, at the time of the Loan Closing, both CIT and Biddle

intended for the CIT Loan to be secured by a first lien on the Property.  However,

irrespective of their intentions to eliminate the Habana Mortgage or to subordinate it,

Habana, and not CIT, continued to possess the first lien on the Property.  *Grisby v.*

---

[17]  Subsection 1735f-7(a)(1) provides, in pertinent part:

> (a) Applicability to loan, mortgage, credit sale, or advance;
> applicability to deposit, account, or obligation
>
> (1) The provisions of the constitution or the laws of
> any State expressly limiting the rate or amount of interest,
> discount points, finance charges, or other charges which
> may be charged, taken, received, or reserved shall not apply
> to any loan, mortgage, credit sale, or advance which is--
>
> > (A) secured by a first lien on residential real
> > property, by a first lien on all stock allocated to
> > a dwelling unit in a residential cooperative
> > housing corporation, or by a first lien on a
> > residential manufactured home; ...

12 U.S.C.A. § 1735f-7a(a)(1).

*Thorp Consumer Discount Co. (In re Grisby)*, 119 B.R. 479, 490 (Bankr. E.D. Pa. 1990)

(holding that first lien existed on debtor's residence "irrespective of the intentions of the

parties to eliminate it."), *vacating judgment and remanding action to bankruptcy court on

other grounds,* 127 B.R. 759 (E.D. Pa. 1991).

The evidence in the record demonstrates that, at the time of the Loan Closing,

Habana maintained a first lien position on the Property because: (i) a balance remained

on Habana's original loan to Debtor after the CIT Loan was made; and (ii) the Habana

Mortgage was not marked satisfied until after this adversary proceeding was

commenced.

CIT and Habana knew that the proceeds from the CIT Loan would not pay off the

balance which Debtor owed to Habana on the Note.  They clearly made an

effort to address the situation (through the Mortgage Subordination Agreement and the

$15,000 Mortgage that was drafted but never executed).  Nevertheless, their efforts

failed, and the Habana Mortgage remained in the first lien position after the closing on

the CIT Loan.[18]

---

[18]  Debtor warranted in the CIT Mortgage that the lien created by the mortgage
was enforceable as a "first lien."  *See supra* n.7.  However, just as the intention of CIT
and Biddle cannot transform the CIT Mortgage into a first lien, Debtor's warranty cannot
do so either. Moreover, it is evident from the record that CIT and Habana, through
Biddle, discussed the subordination of Habana's lien to CIT's lien and that they and not
Debtor created the purported framework for subordinating Habana's lien.
Consequently, it was through no fault of the Debtor that the Habana Mortgage remained
in the first lien position after the refinancing by CIT.

Consequently, Act 6 and its interest rate limitations are applicable to CIT's Loan.
Since the rate of interest on the CIT Mortgage/Loan is 11.99% and the maximum lawful
rate at the time of the closing thereon was 8%, Debtor is entitled to summary judgment
as to liability on Count I of the Amended Complaint.

### III. TILA Claim

Congress enacted TILA in 1969 to "strengthen the national economy by
enhancing the informed use of credit." *Riethman v. Berry*, 287 F.3d 274, 279 (3d Cir.
2002). See also 15 U.S.C. § 1601(a) ("It is the purpose of [TILA] to assure a meaningful
disclosure of credit terms so that the consumer will be able to compare more readily the
various credit terms available to him and avoid the uninformed use of credit[.]").  The
statute is designed to put "the consumer on an equal footing with the lender," *Milledge
v. Chase Bank*, 2007 WL 4179847, at *2 (E.D. Pa. Nov. 26, 2007), by "requiring certain
disclosures regarding loan terms and arrangements." *McCutcheon v. America's
Servicing Company*, 560 F.3d 143, 147 (3d Cir. 2009).  *See also Rossman v. Fleet
Bank (R.I.) National Association*, 280 F.3d 384, 389 (3d Cir. 2002) (TILA "requires a
series of disclosures that must be made before the consummation (the point at which
legal obligations attach) of the underlying credit agreement[.]").

Congress delegated the task of "prescrib[ing] regulations to carry out the
purposes of" TILA to the Federal Reserve Board (the "Board").  15 U.S.C. § 1604(a).  In
response, the Board promulgated "Regulation Z," 12 C.F.R. Pt. 226, and issued
extensive "Official Staff Interpretations," 12 C.F.R. Pt. 226 Supp. I. Id.  The Third Circuit

has stated that "[i]n light of Congress' explicit delegation of authority to the Board,"
courts should "defer quite broadly to the Board's interpretation." *Roberts v. Fleet Bank*,
342 F.3d 260, 265 (3d Cir. 2003).

One of the items which TILA requires lenders to disclose is the applicable
"finance charge" for a mortgage. *McCutcheon v. America's Servicing Company*, 560
F.3d at 147. The term "finance charge" means the "sum of all charges, payable directly
or indirectly by the person to whom the credit is extended, and imposed directly or
indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).
Debtor contends that CIT violated TILA because it underdisclosed her "finance charge"
by failing to include therein: (i) the $151.41 which she was charged for title insurance in
excess of the "refinance rate"; and (ii) the $75.00 title examination fee which she was
charged.

Fees for title insurance and title examination are generally exempted from
computation of a finance charge "in extensions of credit secured by an interest in real
property." 15 U.S.C. § 1605(e)(1). However, they are included as part of the finance
charge if they are not "bona fide and reasonable in amount[.]" 12 C.F.R. § 226.4(c)(7)(i).
In other words, fees for title insurance and title examinations must be included as part of
the finance charge to the extent that are: (i) unreasonable; or (ii) not bona fide. The
Court will separately examine these two fees.

**Title Insurance Fee**

Debtor contends that she was improperly charged the basic fee of $540.75 for

title insurance instead of the refinance rate of $389.34.  Consequently, she argues, the

difference between the two rates, namely $151.41, should have been included in the

finance charge because the excess charge was unreasonable.  *Debtor's Supporting*

*Brief at (III)(B)(3)(b).*  These rates, which are published in the Title Insurance Rating

Bureau of Pennsylvania (the "TIRBOP Manual"), are the ones applicable in March of

2001 for title insurance for a loan of $51,660.  Courts generally use the rates published

in the TIRBOP Manual in determining whether a fee charged for title insurance in

Pennsylvania was reasonable.  *Madera v. Ameriquest Mortgage Company (In re*

*Madera)*, 388 B.R. 586, 599 (E.D. Pa. 2008); *Jones v. Aames Funding Corporation*,

2006 WL 2845689, at *5  (E.D. Pa. March 8, 2006).

According to § 5.6 of the TIRBOP Manual, when a refinance loan is made within

three years from the date of closing of a previously insured mortgage and the premises

to be insured is identical to the real property previously insured and there has been no

change in the fee simple ownership, the refinance rate applies.[19]  *See TIRBOP Manual*

*§ 5.6.*  In Debtor's Brief, she acknowledges that case law in the Eastern District of

---

[19]  The refinance rate is 80% of the reissue rate which, for a loan of $51,660 in
March of 2001, was $486.68.  The reissue rate applies when "the real property to be
insured is identical to or is part of real property insured 10 years immediately prior to the
date the insured transaction closes when evidence of the earlier policy is produced
notwithstanding the amount of coverage provided by the prior policy."  TIRBOP Manual
§ 5.3.

Pennsylvania "holds that 'if a borrower contends that a lender failed to obtain the lowest

title insurance rate permitted by law, she has an affirmative burden to demonstrate that

the lender knew or should have known of the facts justifying that lower rate.'" *Debtor's*

*Brief at (III)(B)(3)(b)* (quoting *Escher v. Decision One*, 369 B.R. 862, 877 (Bankr. E.D.

Pa. 2007) and *citing Madera v. Ameriquest*, 388 B.R. 586, 599-600 (E.D. Pa. 2008)).

Nevertheless, Debtor argues that, under the facts of this case, CIT should have asked

Habana about the existence of previous title insurance. *Debtor's Supporting Brief at*

*(III)(B)(3)(b)*. In support of this argument, Debtor asserts that (i) "Habana orchestrated

the refinance and communicated several times with CIT"; (ii) the 1999 title insurance

held by Habana was only issued to it and not to Debtor; and (iii) the Loan Closing took

place in Habana's office. *Id.* However, the extent of Habana's involvement in the

refinancing is in dispute. Moreover, while Habana was the "insured" on the 1999 title

insurance, Debtor is listed as the individual in whom the interest in land was vested and

there is no evidence in the record that only Habana and not Debtor received written

notice of the policy when it was issued. Standing alone, the fact that the CIT Loan

closing took place at Habana's office is wholly insufficient to conclude that CIT was

responsible for asking Habana whether previous title insurance existed.

However, if Debtor's testimony is believed (that Biddle rather than she

communicated with CIT regarding her refinancing) and all justifiable inferences are

drawn in her favor, there is evidence in the record from which a rational person could

conclude that CIT knew or should have known, based on the information which it

received from Biddle,[20] that Debtor was entitled to a lower rate on her title insurance.

Consequently, under the foregoing analysis of the law and facts,[21] there are material

facts in dispute which prevent the Court from deciding, at this stage of the litigation,

whether the amount which Debtor was charged for title insurance was reasonable.

---

[20] CIT submitted undisputed evidence in support of its Motion that Debtor did not recall buying previous title insurance and that she did not bring anything with her to the closing on her loan from CIT. *Harris-Pena Dep. at 103-04.* Consequently, there is no evidence that CIT knew or should have known from its communications or documents from Debtor that she was entitled to the refinance rate rather than the basic rate on her title insurance. However, as noted above, the facts are in dispute as to whether CIT knew or should have known, vis-a-vis its communications with and/or from documents which it received from Biddle, that Debtor was entitled to a lower rate on her title insurance. Moreover, Exhibit H-15 to the Harris-Pena Dep. indicates that it may have been CIT and not the Debtor who obtained title insurance for the Debtor.

[21] Importantly, the bankruptcy court decision in *Escher v. Decision One,* was recently reversed on the legal point at issue here, namely whether a borrower who contends that a lender failed to obtain the lowest title insurance rate permitted by law bears the burden of demonstrating that, at the time of the closing, the lender knew or should have known of the facts justifying the lower rate. *See Escher v. Decision One Mortgage Company, LLC,* ___ B.R. ___, 2009 WL 3127753, at *6-*12 (E.D. Pa. Sept. 29, 2009). On appeal, the district court held that, prior to the amendments made to TIRBOP in 2005, a borrower was entitled to the refinance rate pursuant to §5.6 of TIRBOP when the following four requirements were met: (1) the refinance occurred within three years of the closing of a previous mortgage; (2) there was title insurance on the previous mortgage; (3) the insured property was identical to the property to be insured; and (4) ownership of the property had not changed. Notably absent from this list of requirements is any burden on the borrower to provide evidence to the lender, at or prior to the closing, of preexisting title insurance to qualify for the refinance rate. While this Court is not bound to follow the district court's ruling in *Escher* in this case, *see Krasny v. Pratpal Bagga (In re Jamuna Real Estate, LLC),* 365 B.R. 540, 573 n.29 (Bankr. E.D. Pa. 2007); *In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 106 n.1 (Bankr. E.D. Pa. 1991), it certainly may do so. However, depending on the evidence that is presented at trial, this Court may find it unnecessary to decide whether to apply the district court's decision in *Escher* to the instant case, so no further comment on this aspect of the matters is necessary at this juncture.

**Title Examination Fee**

Debtor contends that the $75.00 title examination fee which she was charged was unreasonable and, therefore, should have been included as part of the disclosed finance charge. In support of her contention, Debtor cites to §2.3 of the TIRBOP Manual which limits and defines the circumstances under which an insurer may impose additional charges for examining a title. This section states:

> Insurer may impose additional Charges for examination of title which may involve multiple chains of title, land under water, coal, oil, gas or mineral searches, railroad property searches, land in bed of streets, rights-of-way, driveways, foreclosure, tax sales, proceedings under federal bankruptcy or state insolvency related statutes, or which involve other unusual difficulties or unusual expenditures. There shall be a reasonable relationship between the services performed, expenses incurred an the amount charged by the Insurer or Agent.

TIRBOP Manual § 2.3. The material which Debtor has submitted in support of her motion for summary judgment indicates that none of the circumstances listed in §2.3 existed in this case. CIT failed to submit anything that showed that any of the circumstances did exist. Therefore, pursuant to §2.3 of the TIRBOP Manual, the $75.00 which Debtor was charged for a title examination was unreasonable and it should have been included as part of the finance charge.

**Safe Harbor**

TILA contains a "safe harbor" or margin of error for finance charge disclosures. *Strong v. Option One Mortgage Corporation (In re Strong)*, 356 B.R. 121, 165 (Bankr.

26

E.D. Pa. 2004), aff'd, 2005 WL 1463245 (E.D. Pa. June 20, 2005). In other words, the

amount disclosed as a finance charge is considered accurate despite the fact that it

varies from the actual finance charge if it fits within certain tolerance ranges. Pursuant

to 15 U.S.C. § 1605(f), the amount disclosed as the finance charge and other

disclosures affected by the finance charge are "treated as being accurate ... if the

amount disclosed as the finance charge ... does not vary from the actual finance charge

by more than $100[.]" 15 U.S.C. §1505(f). Consequently, even though the $75.00 which

Debtor was charged for a title examination should have been disclosed as part of the

finance charge, the difference between the amount disclosed as the finance charge and

the actual finance charge is less than $100.00, which means that, for purposes of TILA,

the amount which CIT disclosed as the finance charge will be treated as accurate if

Debtor fails to prove at trial that the amount which she was charged for title insurance

was unreasonable.[22] However, since the issue of whether Debtor was charged a

---

[22] Notably, CIT contends that it overdisclosed the finance charge by $179.00
consisting of: (i) a $4.00 Credit Bureau Fee; and (ii) a $175.00
Closing/Escrow/Settlement Fee. While credit report fees are not finance charges so
long as they are bona fide and reasonable in amount, see 12 C.F.R. § 226.4(c)(7)(iii),
there is not sufficient evidence in the record to enable the Court to determine, as a
factual and legal matter, whether the $175.00 Closing/Escrow/Settlement Fee was a
finance charge. This issue is discussed in the Court's discussion of Debtor's claim
under HOEPA. See Discussion in Section IV(c). In the event the Court concludes, after
trial, that the $175.00 Closing/Escrow/Settlement Fee was not a finance charge, then
CIT would have overdisclosed the finance charges in connection with the CIT Loan by
$179.00. This conclusion would mean that even if CIT should have included the
$151.41 which Debtor was charged in excess of the refinance rate in its disclosure of
finance charges, CIT would still be within the "safe harbor" for finance charge
disclosures under 15 U.S.C. § 1505(f).

reasonable amount for title insurance is in dispute, neither party is entitled to summary

judgment on Debtor's TILA.

## IV.  HOEPA Claim

HOEPA was enacted as an amendment to TILA "to address predatory lending

practices targeted at vulnerable consumers." Eugene Kelly, Jr. et al., *An Overview of*

*HOEPA, Old and New,* 59 Consumer Fin. L.Q. Rep. 203 (Fall, 2005) [hereinafter an "*An*

*Overview of HOEPA"]*. It created "a special class of regulated loans that are made at

higher interest rates or with excessive costs and fees."  In re Community Bank of

Northern Virginia, 418 F.3d 277, 304 (3d Cir. 2005).  Loans within the scope of HEOPA

("HOEPA loans") are subject to more "stringent disclosure requirements." *An Overview*

*of HOEPA* at 203.  See also Ross v. Citifinancial Mortgage Co., Inc. (In re Ross), 338

B.R. 266, 270 (Bankr. E.D. Pa. 2006) (noting that additional disclosures beyond those

generally required by TILA must be provided for HOEPA mortgages).  Under HOEPA,

material disclosures must be given "not less than three business days" prior to the

transaction's consummation. 15 U.S.C. §1639(b)(1).

A loan is subject to more heightened disclosure requirements of HOEPA  if "the

total points and fees payable by the consumer at or before closing ... exceed the greater

of (i) 8 percent of the total loan amount or (ii) $400." 15 U.S.C. § 1602(aa)(1)(B).  In

order to determine whether a loan is subject to HOEPA, courts must apply the following

two-step analysis: (1) determine the amount of "points and fees"; and (2) determine

whether those points and fees exceed 8% of the loan amount. *Bell v. Parkway*

*Mortgage, Inc. (In re Bell)*, 309 B.R. 139, 150  (Bankr. E.D. Pa.), *reconsideration*

*granted in part on other grounds*, 314 B.R. 54 (Bankr. E.D. Pa. 2004).

### Points and Fees Analysis

According to §1602(aa)(4), "points and fees" include:

> (A) all items included in the finance charge, except interest or the time-price differential;
>
> (B) all compensation paid to mortgage brokers;
>
> (C) each of the charges listed in section 1605(e) of this title (except an escrow for future payment of taxes), unless--
>
>> (i) the charge is reasonable;
>>
>> (ii) the creditor receives no direct or indirect compensation; and
>>
>> (iii) the charge is paid to a third party unaffiliated with the creditor; and
>
> (D) such other charges as the Board determines to be appropriate.

15 U.S.C. §1602(4)(A)-(D).  Regulation Z also defines the phrase "points and fees,"

stating that it means:

> (i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential;
>
> (ii) All compensation paid to mortgage brokers;
>
> (iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

29

> (iv) Premiums or other charges for credit life, accident,
> health, or loss-of-income insurance, or debt-cancellation
> coverage ....[.]

12 C.F.R. §226.32(b)(1).

The parties agree that the points and fees include the following charges:

| | |
|---|---|
| $495.00 | Underwriting fee to CIT |
| $504.10 | Loan discount fee to CIT |
| $42.00 | Appraisal review fee to CIT |
| $2,550.00 | Mortgage broker fee to Choice One Mortgage |
| $30.00 | Overnight courier fee to CIT |

TOTAL: $3,621.10

*See Memorandum of Law of the Defendant the CIT Group/Consumer Finance, Inc. In Support of its Motion for Summary Judgment ("Defendant's Memorandum") at 17-18; Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment as to Defendant CIT Group/Consumer Finance Inc. ("Plaintiff's Memorandum") at Section III(C) & table in Section III(B)(1).* However, Debtor contends the points and fees also include the following four amounts: (i) the $75.00 title examination fee; (ii) the $151.41 which she was charged for title insurance in excess of the refinance rate; (iv) the $175.00 closing/escrow/settlement fee; and (iv) the $4.00 credit bureau fee. Reviewing these fees, the Court finds that there are disputed issues of material fact which preclude the Court from granting summary judgment on Debtor's HOEPA claim.

### (a) Title Examination Fee

Pursuant to 12 C.F.R. §226.32, "points and fees" includes all items listed in §226.4(c)(7) "unless the charge is reasonable, the creditor receives no direct or indirect

30

compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor[.]"   12 C.F.R. §226.32. Fees for title examination are one of the charges specifically listed in §226(c)(7)(i). "The term 'reasonable' has been defined as whether the charge was for a service 'actually performed,' *In re Bell*, 309 B.R. 139, 151-52 (Bankr. E.D. Pa. 2004), and whether 'the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction,' *In re Crisomia*, 2002 WL 31202722, at *7 (Bankr. E.D. Pa. Sept. 13, 2002) [citation omittted]." *Strong v. Option One Mortgage Corporation (In re Strong)*, 356 B.R. 121 (Bankr. E.D. Pa. 2004).

As discussed above, the $75.00 title examination fee which Debtor was charged was unreasonable under §2.3 of TIRBOP.  Consequently, in accordance with 12 C.F.R. §226.32, it counts as points and fees under HOEPA.

#### (b) Title Insurance Fee

Title insurance is also one of the items listed in §226.4(c)(7).  As discussed above, there are material facts in dispute which prevent the Court from determining whether the amount which Debtor was charged for title insurance was reasonable. Therefore, no determination can be made, at this stage of the litigation, whether the title insurance fee should be included as part of the points and fee calculation.

#### (c) Closing/Escrow/Settlement Fee

According to the HUD-1 Settlement Statement, Debtor was charged a $175 "Closing/Escrow/Settlement Fee."  This fee went to Express Financial Services which, it

31

appears from the record on summary judgment, served as the closing or settlement

agent for CIT's loan to Debtor. *See Exhibit H-16 ("Settlement Statement) to Harris-*

*Pena Dep.*[23] However, there is no evidence in the record showing what service(s) the

$175.00 fee covered.

24 C.F.R. §3500.2, which deals with the Real Estate Settlement Procedures Act

(commonly known as RESPA), provides insight on the reason this category on the

HUD-1 Settlement Statement is titled "Closing/Escrow/Settlement Fee".  Section 3500.2

states:

> Settlement means the process of executing legally binding
> documents regarding a lien on property that is subject to a
> federally related mortgage loan.  This process may also be
> called "closing" or "escrow" in different jurisdictions.

24 C.F.R. §3500.2 (current through March 30, 2001).[24]

The Court note that 12 C.F.R. §226.4(a)(2) contains a special rule applicable to

closing agent charges.  This provision states:

> Fees charged by a third party that conducts the loan closing
> (such as a settlement agent, attorney, or escrow or title
> company) are finance charges only if the creditor:
>
>> (i) Requires the particular services for which
>> the consumer is charged;
>>
>> (ii) Requires the imposition of the charge; or

---

[23] The category entitled "Closing/Escrow/Settlement Fee" appears on line 1101 of page 2 of the HUD-1 Statement.

[24] Since the Loan Closing occurred in March of 2001, the version of 24 C.F.R. §3500.2 that was current through March of 2001 is applicable hereto.

> (iii) Retains a portion of the third-party charge
> to the extent of the portion retained.

12 C.F.R. §226.4(a)(2).  Assuming that this provision is applicable to the

closing/escrow/settlement fee, neither party has provided any evidence in the record on

whether the conditions of §226.4(a)(2) are met.

On the other hand, the Court notes that the Official Staff Interpretation to

§226.4(a)(2) states that a "charge for conducting or attending a closing is a finance

charge and may be excluded only if the charge is included in and is incidental to a lump-

sum closing fee excluded under §226.4(c)(7)."  Applying this statement, a fee charged

by a closing agent for "executing legally binding documents regarding a lien on property

that is subject to a federally related mortgage loan" could be interpreted as constituting

a "finance charge."

In short, the record on summary judgment is inadequate.  It fails to disclose what

service(s) the $175.00 covered.  Without such information, the Court cannot begin to

determine how to apply the relevant federal regulations to decide whether the $175.00

fee constitutes points and fees for purposes of HOEPA.

### (d) Credit Bureau Fee

Debtor was charged $4.00 for a "Credit Bureau Fee."  Presumably this charge

was for obtaining a credit report.  Since 12 C.F.R. §226.4(c)(7) lists "credit report fees,"

this charge is included as part of the points and fee calculation under 12 C.F.R.

§226.32(b)(iii) unless the charge is reasonable, the creditor receives no direct or indirect

33

compensation in connection with the charge, and the charge is not paid to an affiliate of

the creditor[.]"   According to the HUD-1 Settlement Statement, this charge was paid to

CIT.  The Official Staff Interpretation to interpretation to §226.32(b)(iii) states:

> Example. Section 226.32(b)(1)(iii) defines "points and fees"
> to include all items listed in § 226.4(c)(7), other than
> amounts held for the future payment of taxes. An item listed
> in § 226.4(c)(7) may be excluded from the "points and fees"
> calculation, however, if the charge is reasonable, the creditor
> receives no direct or indirect compensation from the charge,
> and the charge is not paid to an affiliate of the creditor. For
> example, a reasonable fee paid by the consumer to an
> independent, third-party appraiser may be excluded from the
> "points and fees" calculation (assuming no compensation is
> paid to the creditor). A fee paid by the consumer for an
> appraisal performed by the creditor must be included in the
> calculation, even though the fee may be excluded from the
> finance charge if it is bona fide and reasonable in amount.

12 C.F.R., Supplement I to Part 226 – Official Staff Interpretations.  Since the $4.00

Credit Bureau Fee was paid to CIT, the Court concludes, based on the example set

forth in the Official Staff Interpretation for §226.32(b)(iii), that it should have been

included in the points and fee calculation.  *See Bell,* 309 B.R. at 150-51 (ruling the credit

report fee was part of points and fees because it was paid to the lender).

### (e) Total Points and Fees

With the addition of the $75.00 Title Examination Fee and the $4.00 Credit

Bureau Fee to the $3,621.10 which the parties agree constitutes points and fees, the

total points and fees, excluding the charges in dispute, are $3,700.10.  The next step is

to determine whether $3,700.10 is less than 8% of the total loan amount.

34

***Total Loan Amount Analysis***

According to the Official Commentary for 12 C.F.R. § 226.32(a)(1)(ii), "the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under §226.32(b)(1) and financed by the creditor." 12 C.F.R., Supplement I to Part 226, Paragraph 32(a)(1)(ii).  Section 226.18(b) provides, in pertinent part:

> The amount financed is calculated by:
>
> (1) Determining the principal loan amount or the cash price (subtracting any downpayment);
>
> (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
>
> (3) Subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b).  The principal loan amount was $51,660.00.  Neither party contends that there are any amounts to be added under subsection (2) above.  Plus, both parties agree that the prepaid finance charge is, at a minimum, $3,621.10.  *See Defendant's Memorandum at 18 (*listing the prepaid finance changes as $3,621.10)*; Plaintiff's Memorandum at 18* (listing the prepaid finance charges at $3,800.10 but including $4.00 Credit Bureau Fee and the $175.00 Closing/Escrow/Settlement Fee in that amount).  Utilizing this figure ($3,621.10) as the amount of prepaid finance charges, the total loan amount was $48,038.90.

**Calculation of Points and Fees as a
Percentage of the Total Loan Amount**

Assuming that the points and fees equal $3,700.10, which does not include either of the charges in dispute, then the points and fees are only 7.7% of the loan ($51,660.00 - $3,621.10 = $48,038.90 and $3,700.10 ÷ $48,038.90 = 77%). However, the points and fees may also include: (i) the $151.41 which the Debtor was charged for title insurance in excess of the refinance rate; and (ii) the $175.00 Closing/Escrow/Settlement Fee which she was charged. According to the Court's calculations, if these amounts are included as points and fees, then the point and fees will not be less than 8% of the total loan amount, which will mean that Debtor's loan from CIT was within the scope of HOEPA. Consequently, Debtor's HOEPA claim under Count III of the Complaint cannot be decided in either parties' favor on summary judgment.

## V. Summary

For the reasons set forth above, summary judgment shall be granted in Debtor's favor and against CIT as to liability on her claim under Act 6 in Count I of the Amended Complaint.  Both parties' motions for summary judgment shall be denied with respect to Debtor's other claims.


HONORABLE STEPHEN RASLAVICH
Chief United States Bankruptcy Judge


Dated: October 13, 2009